**MISSOURI PAC. R. CO. et al. v. TEXAS & PAC. RY. CO. et al.**

(Circuit Court of Appeals, Fifth Circuit. June 6, 1922. Rehearing Denied July 24, 1922.)

No. 3796.

**1. Railroads ⬅167—Mortgage securing bonds held to authorize use of income for repairs.**

A second railroad mortgage securing bonds, the interest on which was payable only in case income available for their payment was earned, the bonds themselves, and the interest coupons attached thereto, *held* susceptible of the construction that the board of directors were not thereby deprived of the right to use income in paying for such repairs and improvements as were reasonably required to keep the railway in good and efficient working condition, and hence, where the board of directors

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

adopted that construction, without dissent from the trustee, or any of the bondholders, though the trustee was formally notified thereof, the interpretation given the contract by the parties should be followed by the court.

2. **Railroads ⟨⟿148—Notes for money borrowed to pay interest on bonds, payable only out of income, not without consideration.**

Where a second railroad mortgage securing bonds to the amount of $25,000,000, the interest on which was payable only in case there was income available for their payment, provided that on nonpayment of interest the trustee might, on request of the holders of one-third of the bonds, take possession of and operate the mortgaged property, and the railroad, under pressure from a company practically owning $23,000,000 of such bonds, borrowed from such company the money with which to pay interest on the bonds, the notes given for the borrowed money were not without consideration, whether or not a state of facts existed calling for the payment of interest.

3. **Contracts ⟨⟿71(1)—Foregoing of remedy to which party entitled sufficient consideration for promise.**

The foregoing by a party of resort to a remedy to which he is entitled is a sufficient consideration to support a promise of another party, subject to be adversely affected by the enforcement of such remedy.

Appeal and Cross-Appeal from the District Court of the United States for the Western District of Louisiana; Rufus E. Foster, Judge.

Proceeding on the claims of the Missouri Pacific Railroad Company and others against the Texas & Pacific Railway Company, opposed by J. L. Lancaster and others, receivers of the last-named company. From a judgment allowing part of the claims, and disallowing others, the parties bring cross-appeals. Affirmed.

Henry Bernstein, of Monroe, La., Carl A. De Gersdorff, and Alfred A. Cook, both of New York City, and J. W. Canada, of Memphis, Tenn., for appellants and cross-appellees.

H. Generes Dufour and Thomas J. Freeman, both of New Orleans, La., for appellees and cross-appellants.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. The decree presented for review dealt with the following matters: (1) Claims asserted by the appellants, Missouri Pacific Railroad Company (herein called the Missouri Pacific Company), owner of more than $23,000,000 of an authorized issue of $25,000,000 of Texas & Pacific Railway Company income bonds, and Mortimer N. Buckner and others, a committee representing certain minority holders of the same issue, that the Texas & Pacific Railway Company (herein referred to as the Texas & Pacific Company) is liable for a large amount of income earned by that company in the years from 1889 to 1915, which was applicable to the payment of interest on its income bonds, but, in violation of the rights of the income bondholders, was wrongfully used by the board of directors of that company for the purpose of maintaining and improving its property. (2) A claim by the Missouri Pacific Company that interest on the Texas & Pacific income bonds owned by it be paid out of earnings of the Texas & Pacific property in the years 1916 and 1917, when that property was

---

⟨⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

in the custody of the court and being administered by its receiver. (3) Claims of the Missouri Pacific Company, based on notes of the Texas & Pacific Company, aggregating $2,569,380, with interest, and on a judgment for approximately $410,000, with interest, based on other notes made by the Texas & Pacific Company. The court ruled against the first-mentioned claims. The intervention claiming interest on the income bonds during the years 1916 and 1917 was dismissed, but without prejudice to the right of the intervener thereafter to assert a claim to interest on its income bonds during the entire period of the receivership. The last above mentioned claims were sustained. The several rulings are complained of by the respective parties adversely affected thereby.

[1] In support of the first-mentioned claim it is contended that under the terms of the income bonds, of the coupons attached thereto, and of the mortgage given to secure compliance with the obligations evidenced by those bonds and coupons, the interest became payable in each year, if and to such extent as the net income of that year, as ascertained in pursuance of ordinary accounting practice, was in fact sufficient to pay the same. An opposing contention is to the effect that the terms of the instruments mentioned authorize the exercise of judgment or discretion by the governing body of the Texas & Pacific Company in determining whether or not there was net income applicable to the payment of interest, and that its determinations in that regard were final and conclusive; no actual fraud or abuse of discretion being alleged or shown. The conflicting contentions call for a consideration of circumstances attending the issue of the income bonds, of provisions contained in the bonds, in the coupons, and in the mortgage, and of conduct of parties to the transactions at and near to the time when the instruments mentioned became effective, indicative of what those parties understood to be the meaning and effect of the instruments. The income bonds were issued in carrying out a plan of reorganizing the Texas & Pacific Company, which was adopted while the property of that company was being administered by a receiver appointed in a suit brought in December, 1885, by a creditor, the Missouri Pacific Railway Company, which, as a result of foreclosure and reorganization proceedings, was succeeded by the appellant Missouri Pacific Railroad Company. When that suit was brought, the Texas & Pacific Company had outstanding various mortgages given to secure debts aggregating the sum of $43,772,000, most of those mortgages covering only different parts of the company's property. For several years before that suit was brought the income of the entire property was substantially less than enough to pay operating expenses and current interest on mortgage indebtedness. Several of the divisions of the road were in bad physical condition, and the income therefrom was insufficient to pay interest on the debt secured by mortgages thereon. The Rio Grande Division, which was covered by the largest of the mortgages, for $13,028,000 principal, was in a condition making it dangerous to life and property and destructive to rolling stock, and did not earn operating expenses.

The bill in the suit in which the receiver was appointed contained averments to the effect that for several years past the earnings of the company were insufficient to pay operating expenses and current interest on mortgage bonds, that the necessary maintenance and repairs of the property had been neglected in a false policy of the board of directors to pay interest on the company's bonded debt as it matured, and that for the current year last past its net income was less than $1,000,000, while the current interest on its mortgage indebtedness was nearly $1,900,000. Features of the adopted plan of reorganization were: A first mortgage, securing $25,000,000 of bonds bearing 5 per cent. interest; a second mortgage, securing $25,000,000 of income bonds, hereinafter described; an authorized issue of $50,000,000 of new stock, $32,165,500 thereof to be issued in exchange for a like amount of old stock outstanding, upon payment of $10 per share; and the distributing of the new bonds (including the full amount of the authorized issue under the first mortgage) and stock to existing creditors and stockholders, the better secured creditors receiving proportionately more of the first mortgage bonds, some of the creditors receiving both first mortgage and income bonds, and the old stockholders, who contributed $10 per share, receiving new shares and the amount of their cash contributions in income bonds. Though the physical condition of the property was improved during the receivership, which lasted several years, as a result of income being used during that time in making repairs and improvements, it clearly appears that when the reorganization went into effect the property and financial conditions of the company were such that there was no reasonable prospect of it being able for any considerable time so to maintain its property as to avoid a foreclosure of the first mortgage, if all of its income above what was required to pay operating expenses, taxes, and interest on the first mortgage bonds had to be applied to the payment of interest on the income bonds. Its property and possible earnings were so pledged or incumbered as to deprive it of a basis for credit, with the result that it was without means of paying for proper and necessary maintenance and improvements, unless it could use current income for those purposes. The first mortgage provides that the mortgagor shall, until default, remain in possession of the mortgaged premises, and, being in possession and as a condition thereof, among other things, expressly covenants and agrees:

"That, using and operating the said railway as the same was heretofore constructed, or as the same or any section or part thereof shall hereafter be constructed and completed, ready for use and operation, it shall and will, at all times, maintain, preserve, and keep the same, and every part thereof, with the rolling stock, fixtures, and appurtenances, and every part and parcel thereof, in thorough repair and working order, at least equal to its present condition in respect to the roadbed, ties and rails, motive power, rolling stock, and equipment, and fully supplied with suitable and sufficient motive power, rolling stock, and equipment, and shall and will, from time to time, make all needful and proper repairs, renewals, and replacements, useful alterations, additions, betterments, and improvements, so as to maintain the same in proper order and in complete repair and good working condition, so that the traffic and business of said road and of every part thereof shall at all times be done with safety and expedition."

By the terms of that mortgage it was subject to be foreclosed for a breach of the just-quoted covenant. The second or income bond mortgage contained the same covenant. Under that mortgage there was no right of foreclosure for default in the payment of interest on the bonds issued thereunder, except in the event of the foreclosure of the first mortgage. Each of the mortgages covers all the railway company's property, franchises, rights, and privileges then owned or thereafter to be acquired, and the second mortgage contains the following provisions:

"That it shall and will well and truly pay, or cause to be paid, to the holders of the second mortgage bonds to be issued hereunder, as hereinbefore stated, or of such of the said second mortgage bonds as shall from time to time be outstanding and secured hereby, and every one of them, the principal thereof, according to the true intent and meaning thereof, and pay interest on said principal sum up to the rate of 5 per cent. per annum from December 1st, 1887, payable annually on the 1st day of March in each year, the first payment, if any, to be due March 1, 1889, in like gold coin out of the net income of the railway company, as the same may be determined by the board of directors of the railway company. If the income of the railway company applicable for the interest on said bonds shall not, in the judgment of the board of directors, be sufficient to pay the said interest in full, such interest, or so much as shall remain unpaid, shall not accumulate. Further, that at all times until said second mortgage bonds, with interest, shall be fully paid, the railway company will permit the trustee, its agents, clerks, or attorneys, for that purpose to be duly authorized, fully to inspect all the books of account of the railway company, together with its books, reports, memoranda, or other papers, and to take such extracts therefrom as may be deemed expedient to fully report thereon, with convenient details, and further, that if at any time the net income of the road hereinbefore conveyed properly applicable to the payment of the interest on the outstanding bonds hereby secured shall be insufficient for such payment, the railway company will, without delay, furnish to the trustee full and detailed accounts and statements of the gross earnings and receipts of said road, and of all the expenses, disbursements, and deductions out of or charged against the same during the period in which there shall be such deficiency. The railway company shall and will from time to time hereafter, upon the demand of the trustee, grant, convey, confirm, assign, transfer, and set over unto the said trustee all real estate which may be hereafter acquired, and all personal estate, corporate rights, and franchises which it, the railway company, shall hereafter in any way or manner acquire as appurtenant to, or in, or for use upon, or for the business of, the railroads hereby mortgaged, or any of them. * * *

"In case default shall be made by said railway company on or after March 1, 1892, in the payment of full interest at the rate of 5 per cent. per annum on any of the second mortgage bonds which may at any time have been issued and be then outstanding and secured by these presents [or in case of other defaults referred to in said article 4], the said trustee shall personally, or by its agent or agents, attorney or attorneys, enter into and upon all and singular the railway property and premises, lands, rights, interests, and franchises hereby conveyed, or intended so to be, and each and every part thereof, and exclude the said railway company, its agents and servants, wholly therefrom and having and holding the same, use and operate, manage and control, said railway, regulate the tolls for the transportation of passengers and freight thereon, and conduct the business thereof, either personally or by its superintendent, managers, receivers, agents, and servants or attorneys, to the best advantage of the interests as well of the public as of holders of second mortgage bonds secured hereby in accordance with law and any statute relating to said railway or any part thereof, or to the operation thereof; and upon such entry it shall be lawful for the said trustee from time to time to insure or keep insured, at the expense of the trust estate, the rolling stock, tools, and machinery, and other property, buildings, bridges, and structures erected

282 F.—5

or provided for use in connection with said railway, and whereof it shall become possessed as aforesaid, in the same manner and to the same extent as is usual with railway companies, and likewise to make from time to time, at the expense of the trust estate, all necessary or proper repairs, renewals, and replacements, useful alterations, additions, betterments, and improvements thereto and thereon, as well in respect of the rolling stock or equipments as in respect of the railway and appurtenances and other subject-matters as may seem to it judicious, and to collect and receive all tolls, freights, incomes, rents, issues, and profits of the same, and every part thereof, and after deducting the expenses of operating said railway and conducting the business thereof, and of all repairs, renewals, replacements, alterations, additions, betterments, and improvements, and all payments which may be made for taxes, assessments, insurance, and other proper charges upon the said premises and property, or any part thereof, as well as a just and reasonable compensation for its own services, and compensation to all agents, clerks, servants, and other employees by it properly engaged and employed, the said trustee shall apply the moneys arising as aforesaid to the payment of the interest which shall be due and payable on the bonds outstanding and secured hereby, in the order in which such interest shall become due, ratably to the persons or parties entitled to receive the same; provided, however, that the holders of a majority of the said bonds may appoint a committee to direct and supervise the management of the property by said trustee, which committee shall have such powers, control, and supervision, as are or may be conferred upon and exercised by the board of directors of the railway company."

The following is the text of the income bond as set out in the mortgage:

"The Texas & Pacific Railway Company * * * acknowledges itself to be indebted unto bearer, or, after registration, to the registered holder hereof, in the sum of one thousand dollars ($1,000), * * * which sum the railway company promises to pay the bearer or registered holder in case of registration on the first day of December, A. D. 2000, * * * and to pay interest thereon out of the net income of the railway company, as the same may be determined by its board of directors at the rate of five per cent. per annum from December 1, 1887: * * * Provided, however, that interest hereon shall be payable to the extent only that such net income, if any, permits, and that interest hereon shall be noncumulative. On and after March 1, 1892, the trustee of the mortgage securing this bond, in case of nonpayment of full interest at 5 per cent. per annum, shall, on request of the holders of not less than one-third of the bonds outstanding, enter into possession of the mortgaged property and manage the same under the direction of a committee appointed by a majority of the bondholders, until payment of interest in full."

The coupons attached to the income bonds are in the following form:

"On the first day of March, A. D. ———, the Texas & Pacific Railway Company will pay to bearer, at its agency in New York, in gold coin, such portions of its net earnings, if any, not exceeding fifty dollars, as shall, in accordance with the mortgage securing the same, be then applicable to the payment of interest on its second mortgage bond No. ———. If there be no net earnings applicable thereto, this coupon will then become void."

By reason of delay in putting the reorganization into effect, 1889 was the first year for which interest on the income bonds was payable, if it was earned and declared applicable. Early in the year 1890 the executive committee of the board of directors of the Texas & Pacific Company met to determine whether interest had been earned and was applicable. The treasurer presented a statement of the income account for the year ending December 31, 1889, which showed a total

net income of $2,023,769.85, against which was charged $173,116.59 for taxes, $1,279,490 for interest on first mortgage bonds, $174,164.32 for new equipment, including boats and barges, $109,664.62 for rentals and sundry expenses, and the balance of $287,334.32 was reserved for betterment and to pay for equipment already contracted for. The just-stated application of income was formally approved by the board of directors as in accordance with the requirements of the second mortgage. Due notice of that action was promptly given to the trustee under that mortgage. Similar action was taken early in the year 1891 in reference to the income earned in the year 1890. On January 1, 1892, the president of the company addressed a communication to the trustee under the second mortgage, which, after calling attention to the provision of that instrument authorizing the trustee, on and after March 1, 1892, in case of nonpayment of full interest at 5 per cent. per annum, etc., to enter into possession of the mortgaged property, etc., and stating that there was no reason to believe that the earnings of the road in 1891 were sufficient to enable the company to pay 5 per cent. interest on its income bonds on March 1, 1892, invited an investigation of the accounts of the road. In response to that suggestion the trustee engaged a firm of accountants to make the necessary examination. The report of the accountants pointedly raised the question of the propriety of charges made against income for new and substantially increased equipment.

In the face of that criticism the board of directors by formal resolution showed that the failure to pay interest on the income bonds was due to the fact that the earnings of the company for the year 1891 were insufficient to enable the company, after the payment of its fixed charges, necessary repairs, rentals, and additions, to have a surplus applicable to the interest on the income bonds, and that provisions of the second mortgage were construed to have the effect of not requiring payment of interest on the income bonds if the surplus of income, after paying fixed charges, not including interest on the income bonds, was consumed in paying for needful and proper repairs and renewals, replacements, useful alterations, additions, betterments, and improvements, so as to maintain the company's roadbed and property in good working condition, so that the traffic and business of the road and every part thereof shall at all times be done with safety and expedition. That action of the board of directors was duly and promptly communicated to the trustee under the second mortgage, and was duly approved by the stockholders. No protest or objection thereto was made by the trustee, or by any bondholder or other party in interest. Similar action was taken each year thereafter up to and including the year 1899, and in most of the succeeding years down to and including 1915, and the propriety of it, so far as appears, was not questioned by anyone for many years.

During the latter part of the period ending with the year 1899, the St. Louis, Iron Mountain & Southern Railway Company (herein called the Iron Mountain Company), which was exclusively owned and controlled by the Missouri Pacific Railway Company, acquired about $23,-000,000 face value of Texas & Pacific income bonds, and pledged the

same to secure an issue of bonds by itself. Until after that occurred there was no payment of interest on income bonds, and no assertion by any interested party that the use made of income conferred any enforceable right on income bondholders. In 1900 the Texas & Pacific Company paid for the year 1899 1½ per cent. interest on its income bonds. For the year 1900 it paid 4 per cent. interest, and for the year 1901 it paid 5 per cent. interest. During several succeeding years interest was paid, the money required therefor being borrowed from the Missouri Pacific Railway Company, to which were executed notes hereinafter referred to. During each of the years for which no interest on the income bonds was paid the earnings of the company amounted to substantially more than enough to pay operating expenses and charges having unquestioned priority over interest on the income bonds, and the recorded proceedings of the board of directors plainly disclosed that parts of such earnings were applied in paying for maintenance, repairs, betterments, improvements, etc.

It cannot fairly be denied that provisions contained in the income bonds, in the coupons, and in the second mortgages, considered together and in the light of attending circumstances, are such as furnish support for the contention that the board of directors of the maker of those instruments was authorized to use its judgment or discretion in determining both the existence or nonexistence of net income, and whether, if it existed, it was properly applicable to the payment of interest on those bonds. The promise in the bonds is "to pay interest * * * out of the net income" of the maker "as the same may be determined by its board of directors at the rate," etc. The coupons show the agreement of the maker to pay "such portions of its net earnings, if any, not exceeding fifty dollars, as shall, in accordance with the mortgage securing the same, be then applicable to the payment of interest on its second mortgage bond No.," etc. The covenant in the mortgage is to "pay interest on said principal sum up to the rate of five per cent. per annum * · * * out of the net income of the railway company, as the same may be determined by the board of directors of the railway company. If the income of the railway company applicable for the interest on said bonds shall not, in the judgment of the board of directors, be sufficient to pay the said interest in full, such interest or so much as shall remain unpaid shall not accumulate." In each stipulation as to the payment of interest on income bonds the terms "net income" and "net earnings" are used in connection with other language which, if not superfluous, was misleading, if there was an absence of intention to qualify or limit the meaning which would have been expressed, if such other language had been omitted.

The provisions quoted signally failed to express clearly the meaning intended, if the intention of the parties was to leave to the board of directors only the ascertainment, in accordance with ordinary accounting practice, of the amount of net income, if any was earned, and to withhold from that body the right to exercise its judgment or discretion in determining what, if any, net income was earned, and the application thereof, if any was found to exist. It seems that lan-

guage materially different from that above quoted would have been used if the intention had been to entitle the income bondholders, absolutely and without qualification, to any surplus of income remaining in each year after paying therefrom operating and other expenses admittedly entitled to priority, the mortgagor's board of directors to perform only the purely accounting and arithmetical task of ascertaining the amount, if any, of such surplus, and not to have the power or right to exercise its judgment or discretion in determining the expenditures to be deducted from and charged against income, or how any part of such surplus, if found to exist, should be applied, if the amount of it should be less than enough to pay 5 per cent. interest on the income bonds. When those provisions were framed and went into effect, it was not a novelty for the managing body of a debtor corporation to be recognized as having the right to charge against income the amounts of expenditures for repairs, ordinary and proper additions and improvements, not amounting to a substantial enlargement of its plant, and new equipment reasonably required for the proper conduct and development of the business. Union Pacific Railway Co. v. United States, 99 U. S. 402, 420, 25 L. Ed. 274; United States v. Kansas Pacific Railway Co., 99 U. S. 455, 25 L. Ed. 289; Fosdick v. Schall, 99 U. S. 252, 25 L. Ed. 339.

The second mortgage itself provided for the trustee under it ousting the board of directors, and operating, managing, and controlling the mortgaged property. Terms of the provision on that subject clearly show that it was contemplated that, in the event of the trustee so displacing the board of directors, there would be nothing to be applied to payment of interest on income bonds until the expenses "of all repairs, renewals, replacements, alterations, additions, betterments, and improvements" were paid out of current earnings. The circumstances attending the company's starting life anew under the reorganization were such that there could not have been any reasonable expectation that the just-mentioned expenses could or would be paid, either by the board of directors or by the trustee under the second mortgage, otherwise than out of income. Everything the company had then or thereafter was mortgaged. In the then condition of its property and business, its income was greatly less than enough to pay operating expenses, taxes, interest on the first mortgage bonds and 5 per cent. interest on the second mortgages. It was apparent that to require all those items to be paid out of income before any of the income could be used to pay the expenses of bettering or improving the company's property or business meant that the company would start out under the reorganization with an obvious lack of financial ability to live up to its requirements, and that the entire property soon would be subject to foreclosure under the first mortgage. There was an absence of any reason to expect an early payment of 5 per cent. interest on the income bonds. Whether in the future enough income to pay such interest would or would not be earned was dependent on the future development and improvement of the company's property and business. It cannot be supposed that the first mortgage bonds would have been acceptable as long-time investments, if it had been understood

that the maker could not use any of its income to pay the expenses of complying with the covenant of the first mortgage as to repairs, additions, betterments, improvements, etc., until 5 per cent. interest on the income bonds had been paid out of income. If so deprived of command of any of its income, the company was without available means of complying with the requirements of the first mortgage, with the result that an early foreclosure thereof was to be expected. Those who paid in $10 a share on stock and those who accepted income bonds in payment in whole or in part of existing debts owing to them could not well have expected to share in the benefits of anticipated increased earning capacity of the debtor, if they also expected that under the reorganization adopted the affairs of the debtor would be so arranged that it would be unable to make the outlay obviously required to enable it to continue to be a going concern and to increase its earning capacity.

In determining the meaning of the provisions as to interest on the income bonds, it is proper to consider, not only the language of those provisions, but the situation dealt with by the transaction of which the instruments containing those provisions were parts, and the objects or purposes sought to be accomplished by the parties to that transaction. As above suggested, the language used, standing by itself, indicates that the meaning intended was materially different from the one now attributed to it in behalf of the income bondholders. The expressions as to any part of the company's earnings being applicable for interest on the income bonds are similar to those contained in provisions which, in the case of New York, etc., R. R. Co. v. Nickals, 119 U. S. 296, 7 Sup. Ct. 209, 30 L. Ed. 363, were held to have the effect of making the question whether income in any year was to be used to pay interest or dividends, or for other purposes of the debtor corporation, one for the determination of its board of directors. The concluding sentence of the last above quoted provision of the second mortgage plainly shows that it was contemplated that the company's board of directors would exercise its judgment in determining whether the company's income in any year was or was not sufficient to pay 5 per cent. interest on the income bonds. No exercise of the board's judgment would be involved, if its sole function in the matter of interest on income bonds being payable or not was that of ascertaining, in pursuance of ordinary accounting practice, what, if any, net income there was, and provisions of the mortgage had the effect of determining how such net income, so ascertained, must be applied. It is not to be supposed that the reorganization would have been agreed upon, if the parties thereto had understood that a feature of the plan adopted could not be complied with without practically insuring the futility of the effort.

We think that the above-stated considerations warrant the conclusion that the provisions as to interest on the income bonds were fairly susceptible of the construction that they did not deprive the company's board of directors of the right or power to use income in paying for what was reasonably required in keeping the company's railway in good and efficient working condition, with the result that income bond-

holders would not be entitled to interest unless there was a surplus of income after deducting therefrom the amounts of such expenditures and other expenditures plainly accorded priority. It is clearly disclosed that the board of directors which was in charge when the reorganization went into effect adopted and acted on that construction, which was followed for many years thereafter. The trustee under the second mortgage was formally notified of that action of the board of directors. It did nothing indicating dissent therefrom. So far as appears, no one who was a holder of an income bond at or near the time when the reorganization went into effect did or said anything indicating nonacquiescence in the construction by the board of directors of the provisions in question.

During the many years of such silence and inaction of income bondholders the company's income each year was substantially more than enough to pay operating expenses, taxes, and interest on the first mortgage bonds. Knowledge of that fact, and of the fact that the surplus was being used to pay for maintenance, improvements, new equipment, etc., was readily accessible, being disclosed by the company's formal and public reports. It may be inferred that many of the income bondholders were aware of those facts, and that payment of interest would have been demanded by some of them, but for a general acquiescence of interested parties in the validity of the action of the board of directors in using surplus of income left after deducting expenditures obviously entitled to priority for purposes other than the payment of interest on income bonds. The provisions in question are considered not to be such as to justify the court in giving them a meaning other than the one which the conduct of the parties to the transaction in which they were used shows that those parties understood and intended them to have when the transaction was entered into and put into effect. The case is one for the adoption by the court of the interpretation given to a contract by the parties thereto. Huntting Elevator Co. v. Bosworth, 179 U. S. 415, 435, 21 Sup. Ct. 183, 45 L. Ed. 256; Thronateeska Pecan Co. v. Matthews (C. C. A.) 277 Fed. 361. It was not made to appear that income of the Texas & Pacific in the years from 1889 to 1915 was so used by its board of directors as, under the contract as so construed, to have the effect of subjecting that company to the liability to the holders of its income bonds which is asserted in this case. It follows that the court did not err in disallowing the claims first above mentioned.

In the situation existing at the time the decree appealed from was rendered, it was permissible for the court to leave open the question of the proper application of income earned during the receivership. The disposition made of the intervention claiming interest on the income bonds for the years 1916 and 1917 did not involve reversible error.

[2] On February 8, 1904, the board of directors of the Texas & Pacific Company adopted a resolution to the effect that there was no net income in 1903 applicable to the payment of interest on income bonds on March 1, 1904. The minutes of a meeting of the board on February 10, 1904, disclose that the just-mentioned action taken two

days before had met with great objection on the part of prominent interests in the Missouri Pacific Railway Company, the owner of all the stock of the Iron Mountain Company, which then held upwards of $23,000,000 of the income bonds; that it had been proposed that the Missouri Pacific Railway Company or the Iron Mountain Company would advance to the Texas & Pacific Company the funds required to pay full interest on the income bonds and take notes therefor; that in that connection attention was called to the provisions of the second mortgage in respect to paying interest and the remedies in the case of a failure to do so; and that thereupon a resolution was adopted authorizing the payment of 5 per cent. interest on the income bonds on March 1, 1904, the borrowing of the amounts of money required to pay such interest, and the giving of the proposed notes. Thereupon the amount required to pay interest was borrowed and notes given therefor. During several succeeding years interest on the income bonds was paid with money obtained in the same way. There were renewals of notes so given. The notes recovered on in this case were some of those renewal notes.

It was contended that the original notes were issued without consideration, because the maker of the notes did not by making them acquire anything for its own use, but became merely the conduit through which money furnished passed from the principal income bondholder back to itself and the other income bondholders; the net result of the transaction being an exchange of income bond coupons for the mortgagor's notes for the same aggregate amount, whereby an apparently enforceable obligation of the mortgagor was substituted for a contingent and really unaccrued charge against part of the mortgagor's income. We do not think that that contention properly can be sustained. Under the second mortgage a failure on and after March 1, 1892, to pay 5 per cent. interest on the income bonds had the effect of entitling the trustee under that mortgage, on the request of the holders of not less than one-third of the income bonds outstanding, to take possession of and operate the mortgaged property, and to exclude the mortgagor wholly therefrom. The existence of the right so given was not made dependent upon the presence or absence of a reason or excuse for a failure to pay interest.

The Missouri Pacific Railway Company, being practically the owner of more than one-third of the income bonds outstanding, was in a position to bring about the exercise of that right. It is quite apparent that the action of the board of directors of the Texas & Pacific Company in authorizing the giving of notes for money borrowed for the purpose of paying interest on the income bonds followed pressure exerted by or in behalf of the Missouri Pacific Railway Company, and that in yielding to that pressure the board was influenced by a consideration of the remedy given by the second mortgage in the case of a failure to pay interest on the bonds secured thereby. The giving of the notes well may be regarded as the price paid by the maker for the privilege of retaining possession of its property and the operation thereof. What was done may be attributed to the desire of the debtor to continue to have the opportunity to make a success of its enter-

prise, instead of the chance or possibility of such success becoming dependent upon the capacity, wisdom, and good faith of a third party, put in possession and control at the instance of creditors having a contract right to do so.

[3] The refraining by the income bondholders to exercise a right they possessed was a valuable consideration moving from them to the maker of the notes. The foregoing by a party of resort to a remedy to which he is entitled is a sufficient consideration to support a promise of another party, who is subject to be adversely affected by the enforcement of that remedy. Whether, when any of the original notes in question were given, there did or did not exist a state of facts calling for the payment of interest on the income bonds, is a question not affecting the validity or enforceability of the original notes or of renewals thereof. It is not claimed that the notes sued on or the judgment on other renewal notes were unenforceable, if the original notes were binding obligations. We do not think that the court erred in decreeing payment of the amounts called for by the notes and the judgment sued on.

There is no error in the record. The decree should be affirmed, each party to be taxed with the costs incurred at its instance after the rendition of that decree; and it is so ordered.

Affirmed.